IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 21, 2017 Session

## IN RE WYATT B.

**Appeal from the Juvenile Court for Hamilton County**
**No. 267068, 267592, 268180      Robert D. Philyaw, Judge**

_____

### No. E2016-02116-COA-R3-JV
_____

This appeal concerns a change of child custody. Jonathan B. ("Father") filed a petition against Tabitha O. ("Mother") in the Juvenile Court for Hamilton County ("the Juvenile Court") seeking to become the primary residential parent of the parties' minor child, Wyatt B. ("the Child"). After a trial, the Juvenile Court found a material change in circumstance sufficient to modify custody and that changing the Child's primary residential parent from Mother to Father was in the Child's best interest. Mother appeals. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Jacqueline Strong Moss, Chattanooga, Tennessee, for the appellant, Tabitha O.

Robert B. Pyle, Chattanooga, Tennessee, for the appellee, Jonathan B.

# OPINION

## Background

Mother and Father are parents of the Child, who was born in October 2009. Mother and Father never married. Ten months after the Child's birth, Mother and Father separated. The Child suffers from eosinophilic esophagitis. In 2011, a parenting plan was entered by court order. Mother was designated primary residential parent under the original plan. Father was to have the Child every other weekend, with additional time as agreed. At one point, Mother relocated to North Carolina from Tennessee. Father filed a petition in opposition to the relocation. Father also petitioned for custody of the Child. Additional procedural events unfolded in this case leading to a trial on the issue that is now before us on appeal: whether a material change in circumstance occurred sufficient to modify the Child's primary residential parent from Mother to Father. The trial was in July and September 2016. We next cite to the relevant testimony from trial.

Officer Kevin Otto ("Otto") of the Chattanooga Police Department testified. Otto stated that he had been to Mother's home several times in the past year at Father's request. According to Otto, a court order reflected that Father was entitled to visit the Child on certain occasions, but that Father's access to the Child had been denied. However, Otto also testified to one incident in which he planned to take out a warrant against Father for custodial kidnapping had Father not returned the Child to Mother by midnight.

Father testified, in part, as follows:

Q. Okay. Are there any other problems that are going on that you want the judge to address when he issues his ruling in this case?
A. Other problems have been that she just takes everything in her own hands. She pretty much just thinks everything is her idea and it's going to go her way. And there's usually nothing I can do about it. So that has been a problem.
Q. Give some examples.
A. Like going to pick him up. I always think that it should be me and her that does the exchange, where she always throws her grandparents in it so she don't have to deal with it. I mean, I have to be there. I don't see why she doesn't have to be there. And she says she doesn't, so she's not.
Q. And you have a mother that's very involved with the child?
A. Yes.

\*\*\*

-2-

Q. All right. There was a period of time -- let's talk a little bit about the doctors. When Wyatt was first involved with medicine, when he first got -- discovered this, it was discovered by a Chattanooga doctor; is that right?

A. Yes. It was discovered by Jeremy Screws at T. C. Thompson.

Q. Okay. And when did -- when and why did Dr. Screws get out of the picture?

A. She -- there was a visitation where I got him and he was supposed to have vegetables only, I believe, is what it was at that time, or soy only, and she had sent beef stew with me for him to eat. Of course, he was not supposed to have potatoes. And there was potatoes in the soup. Well, she told me, "Well, just take the potatoes out." Well, to me, that did not seem right. So I actually took him to Dr. Screws and confronted him about it. And Dr. Screws was going to turn her in for -- I forget how it was worded. But neglect of feeding him right. She wasn't feeding him right. So as soon as she caught word of that, she left Dr. Screws and went to Vanderbilt. I guess so that she didn't get in trouble.

Q. All right. And how long were y'all with Vanderbilt?

A. About three or four years, I believe.

Q. All right.

A. It was a good amount of time.

Q. How did you-all and Tabitha get along with the Vanderbilt doctors?

A. At first I was not even allowed to be involved. She had me blocked from everything. I had to eventually come to the Court and get a piece of paper saying that I had rights to be there. And I had to submit them to all of his doctors. I had to find all his doctors myself. I had to call Vanderbilt. I went through trouble just trying to find out when his appointments were. It wasn't until he had been there about a year later, I finally got all the doctors on the same page and it all started to work. Towards the end it worked well. All the doctors knew who I was, knew who she was, and knew the situation. So it all worked very well in the end. And, in my opinion, they fixed it.

***

Q. All right. Tell the Court what problems you've been having when you get notified of doctor's appointments and show up.

A. The last one I had the biggest problem with was the dietitian appointment. And I took off work the whole day and I sat in the doctor's office for up to two hours waiting on Tabitha and Wyatt to show up. They never showed up. They never called in to reschedule. And I was never told

-3-

of a reschedule date. Other times I've had problems. I have to call the doctor myself and get when his next dates are, next appointments. But here recently she's told me about a couple in October. I think October the 19th is the next one. Recently has been the only time she's ever told me without me having to find out first. She's never told me when she found out.

Q. Okay. And under this new agreement, assuming it's acceptable to the Court and it's approved by the Court, you would still want to make sure that if she changes the date, you find out when she finds out?

A. Yes.

Q. Now, you said you sat there for two or three hours. When did you actually find out that that appointment had been canceled?

A. I actually went up -- after an hour and 45 minutes, I think it was, I finally got up and went to the front desk and asked how long it takes till they actually cancel the appointment. And they said, "Well, usually an hour or two." And I said, "Well, it's been almost two hours." So they wrote me a note saying that -- like, what they would send her in the mail, saying that she didn't show up and she needed to call in and reschedule. And I never was notified of the reschedule. So about two hours.

Q. Did you eventually find out when it was rescheduled?

A. After it happened, yes.

Q. Okay.

A. So after it happened, she called me and provided me the next weekend I picked him up with the paperwork. But this was after the appointment. So I never had a chance to be at the appointment.

Q. And this was the dietitian?

A. Yes.

Q. And so it would be important for you to have that so you would know how to take care of feeding on your weekend?

A. Yes.

Q. Okay.

A. Very important.

For her part, Mother testified as follows:

Q. And Magistrate Owens wanted you-all talking to each other; is that right?

A. Yes, sir. Uh-huh.

Q. So?

A. I've been told by my attorney once again that me and Jonathan can't stop arguing and we cannot get along, that it needs to go through the attorneys until we can figure it out.

Q. So it doesn't matter what Judge Owens says, it's just a matter of you aren't going to do it.

A. It goes -- I'm going by my attorney.

Q. Okay. And not by a Judge.

A. I'm going by my attorney who said not to speak to him.

Q. Okay.

A. We cannot get along.

***

Q. So, so Wyatt was back in town and you didn't allow visitation.

A. I was told by my attorney not to. We had court coming.

Q. The long and the short of it is, no visitation.

A. And once again, my attorney.

Q. How many attorneys have you had, by the way?

A. Three. Oh, wait. On that one, four. I've had four. That was from 2011, right? There was a different attorney on that one.

Q. I was going to say, I remember four, at least.

A. Yeah. He's, he's a different attorney.

Q. As part of his regular three month physical, does he get an endoscopy?

A. He was until -- May of last year he went in remission. There was no reason to scope him every three months once he hits remission. Before that, it was every three months.

Q Okay. But you're saying that it no longer is necessary.

A. He's being scoped tomorrow. After so long, about a year, they usually want to rescope after it's been so long just to see if the numbers are still low, if he's still in remission, or if the numbers are high again.

Q. Did you notify [Father] about the, the physical tomorrow?

A. No. The doctor's office said they would call him and let him know.

Q. Did the -- did the parenting order tell you to do the notification?

A. What parenting order?

Q. The one that you and your attorney, Tabitha Finch --

A. Those are no longer -- those aren't in effect, so I'm not really sure why you're asking me that. We're not using those.

Q. When did it go out of effect?

A. It hasn't been signed. If it was -- if we -- they want to agree on it, there, there -- it would make sense. But after those -- after I signed those and Jonathan signed those, things changed. That's why there's still things that aren't agreed upon.

Q. When did your signature get removed from this document?

A. I just said I signed it, but circumstances change. I no longer agree with that. I just said that.
Q. When did your signature get removed from here?
A. Oh God. My signature is on it. I just said that more than once.

In September 2016, the Juvenile Court entered its final judgment changing the Child's primary residential parent from Mother to Father. Father was awarded 183 days with the Child to Mother's 182.[1] The Juvenile Court found and held as follows, in pertinent part:

The child was diagnosed with eosinophilic esophagitis as an infant and was treated by Dr. Screws at Children's Hospital at Erlanger for over a year. During this time, Mother and Father lived together with the child. The Father attended doctor's appointments and saw the child every day. In the second year of the child's life, Mother left with the child.

Father testified that Mother denied him access to the child and he agreed to the 2011 Order because "it was better than nothing". Father testified that Mother continued to deny visits often and that despite his pleas he rarely saw the child outside of the times required in the Order.

***

Mother entered into another relationship, married, and moved with the child to North Carolina. Mother did not give Father timely notice of her intended move out of state. During the time Mother and child lived in North Carolina, Father again attempted to be involved in the child's health care.

Father did not see the child for some six months except for one trip to attend a doctor's appointment in Riley, NC. Father requested a visit then but Mother refused unless Father drove another approximate three (3) hours. In her testimony, Mother said she offered Father to come stay in her house with the child. During the time she was in North Carolina Mother returned to Chattanooga twice for court but denied Father visitation with the child both times.

---

[1] The Juvenile Court termed this arrangement 'joint custody,' but the legal effect of the Juvenile Court's ruling was to make Father primary residential parent. *See Brown v. Brown*, No. E2011-00421-COA-R3-CV, 2012 WL 1267872, at *7 (Tenn. Ct. App. Apr. 13, 2012), *rule 11 appl. perm. appeal denied Aug. 15, 2012.*

While his request for modification was pending Father filed a "Petition in Opposition to Removal of Child from Tennessee". Before that matter was fully heard, Mother and child moved back and ultimately into a home owned by maternal great grandparents.

Mother testified that she has lived with her great grandmother, in Georgia, back with her great grandmother, in a couple houses in North Carolina, and in a house owned by her great grandparents within the last approximate eighteen (18) months.

Mother now rents a home from her great grandparents who she relies on for childcare most every day. Father married three years ago and lives in a two bedroom home with his wife and her two boys, ages four (4) and eight (8).

Father works independently as a subcontractor tile-layer, has a steady business, and sometimes travels to Kentucky and Ohio for a few days at a time for work. The stepmother is primarily a home-maker. Mother has had several jobs since this matter has been pending and currently works at a drycleaning facility. Father has consistently paid Two Hundred Seventy Dollars ($270.00) per month child support to Mother. The child has insurance through the State.

*** 

Throughout the hearings in this case, the Court noted Mother's lack of appreciation for the tone of the proceedings and the proof presented against her appropriate parenting of the child, particularly regarding her controlling approach to managing the Father's access to the child, the child's medical care, education, and Father's relationship with the child. It is clear to the Court that Mother does not desire for Father and child to have a relationship. What is more troublesome is that Mother seems unabashed by that and unconvinced that Father should be involved in their son's life at all.

*** 

Since the 2011 Order, the child's medical condition has improved significantly, the child has lived in multiple homes, both Parents have married, the Mother is going through a divorce, the Mother has denied Father appropriate access to child's medical care, and the Mother has not followed the Order, primarily in that she routinely denies Father access to

the child in violation of the Order and has refused to follow the parenting plan.

The Court finds that a material change of circumstances has occurred that make the parenting plan of the 2011 Order no longer in the best interest of the child. The Court further finds that the parenting issues at the heart of this matter have affected the child's well-being in a meaningful way. While some of the Mother's actions could have been anticipated due to the pre-Order history, the extent and depth of Mother's failure to adhere to the parenting plan could not have been reasonably anticipated by Father.

***

The Mother's and Father's moral, physical, mental and emotional fitness as it relates to their ability to parent the child is not a factor except that Mother has shown to be so unreasonably overprotective and controlling of Father's parenting of the child that it may be reflective of an inappropriate emotional dependence on the child.

The child is blessed to have a family that cares for him deeply. The child enjoys an appropriate relationship with Father's wife and sons and with Mother's great grandparents. The Court does have significant concerns about the stepfather, but it appears that Mother is well on her way to getting a divorce and since there is an order restraining him from coming around her, it does not appear to be a factor in this part of the analysis. The great grandmother is unfortunately working on a cancer diagnosis as well as is another adult relative who lives with her and great grandfather. From all indication, the child is in a great school environment.

The child has had relatively little stability as the Mother has moved more than several times since the breakup of Mother and Father. There is no evidence of physical or emotional abuse to the child except that which surfaces from seeing the interactions of the adults in his life and from hearing derogatory remarks to and about his Father.

Mother timely filed an appeal to this Court.

**Discussion**

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred in finding a material change of circumstance sufficient to modify custody.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

This Court has outlined the analysis to be employed when a child's primary residential parent, as opposed to simply the details of the residential schedule, is at issue:

> Adjudicating disputes over who should be designated the primary residential parent is one of a court's greatest responsibilities. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). A court's designation of the primary residential parent as part of a final decree of divorce is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, because circumstances change in unanticipated ways, courts are statutorily empowered to modify a primary residential parent designation. *See* Tenn. Code Ann. § 36-6-101(a)(1) (A decree awarding custody of minor child "shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require.").

> Courts apply a two-step analysis to requests to change the primary residential parent designation. *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). The threshold issue is whether a material change in circumstance has occurred since the court's prior custody order. *See Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013); Tenn. Code Ann. 36-6-101(a)(2)(B). Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. The "determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

*Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *5 (Tenn. Ct. App. Oct. 27, 2015), *no appl. perm. appeal filed*.

> Regarding a material change in circumstances, this Court has stated:

> > There is no bright line rule for determining when a change in circumstance is material enough to warrant changing an existing custody arrangement. *Keisling*, 196 S.W.3d at 718. Instead, when making this determination, courts should consider: "(1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way." *Cranston*, 106 S.W.3d at 644. A material change in circumstance does not require a showing of a substantial risk of harm to the child. Tenn. Code Ann. § 36-6-101(a)(2)(B). Such a change includes "circumstances that make the parenting plan no longer in the best interests of the child." *Id*.

*Robinson v. Robinson*, No. M2014-00431-COA-R3-CV, 2015 WL 1259265, at *3 (Tenn. Ct. App. March 16, 2015), *no appl. perm. appeal filed*. (Footnote omitted).

Tenn. Code Ann. § 36-6-106(a)(Supp. 2016) sets forth the following factors related to the best interest of the child:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of

the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement

with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Mother argues on appeal that the Juvenile Court erred in finding a material change in circumstance. According to Mother, the Juvenile Court's findings do not reflect a substantial impact on the Child's well-being, but rather only matters impacting the parents. Mother acknowledges, however, that a material change in circumstance sufficient to modify the residential parenting schedule has occurred. Father bore the burden of proof at trial.

We disagree with Mother's characterization of the Juvenile Court's final judgment and the evidence contained in the record. The Juvenile Court found that Mother has a "controlling approach to managing the Father's access to the child, the child's medical care, education, and Father's relationship with the child." The Juvenile Court found further that "Mother has denied Father appropriate access to the child's medical care . . . [and] she routinely denies Father access to the child in violation of the Order . . . ." Finally, the Juvenile Court found that "the parenting issues at the heart of this matter have affected the child's well-being in a meaningful way." We extend considerable deference to the credibility determinations of trial courts. The Juvenile Court implicitly credited Father's testimony over Mother's regarding the factual events of the case since the

implementation of the original parenting plan. The evidence does not preponderate against the Juvenile Court's factual findings.

While neither parent in this case has behaved perfectly, Mother's failure to adhere to the parenting plan or communicate adequately with Father when appropriate regarding the Child's medical needs impacts the Child's well-being in a significant manner. Father's testimony, credited by the Juvenile Court, reveals the pattern of a detrimental cat-and-mouse game whereby the Child is withheld from Father by Mother despite the terms of the previous parenting plan with medical information concerning the Child often being delivered by Mother in roundabout or insufficient means.

We find and hold, as did the Juvenile Court, that a material change in circumstance has occurred sufficient to warrant examining whether a change in primary residential parent is in the Child's best interest. This next step in the analysis is determining whether changing the Child's primary residential parent from Mother to Father is in the Child's best interest. The Juvenile Court properly considered all the relevant best interest factors. We find that the evidence does not preponderate against the Juvenile Court's findings relative to the Child's best interest. We discern no reversible error in the Juvenile Court's decision to change the Child's primary residential parent from Mother to Father, and to enter a new parenting plan in accordance with the change in designation. We affirm the judgment of the Juvenile Court.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against Tabitha O., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE